IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL HUTCHINSON,  )  No. C 02-974 JSW (PR)
                     )
          Petitioner,  )  **ORDER GRANTING PETITION**
                     )  **FOR A WRIT OF HABEAS**
     vs.             )  **CORPUS BASED ON**
                     )  **INEFFECTIVE ASSISTANCE OF**
JIM HAMLET, Warden,  )  **COUNSEL AND DENYING JURY**
                     )  **INSTRUCTION CLAIM**
          Respondent.  )
—————————————————————  )

## INTRODUCTION

Petitioner, a California state prisoner, filed a pro se petition for a writ of habeas

corpus under 28 U.S.C. § 2254.  On April 30, 2002, Judge Maxine M. Chesney

dismissed one claim for failure to state a cognizable claim and ordered Respondent to

show cause why the writ should not issue as to two other claims (docket no. 5).  On June

11, 2002, Respondent filed an answer to the petition and a memorandum of points and

authorities and exhibits in support thereof (docket nos. 7-9).  Petitioner filed a traverse

on August 13, 2002 (docket no. 16).  On January 14, 2003, the matter was reassigned to

this Court (docket no. 20).  Counsel for Petitioner filed a notice of substitution of counsel

appearing pro bono on May 24, 2005 and were appointed by the Court pursuant to 18

U.S.C. § 3006A on January 27, 2006 (docket no. 30).

After briefing by the parties on whether Petitioner's ineffective assistance of

counsel claim was rendered unexhausted by a forensic evaluation conducted by Gregg

Stutchman on behalf of the San Jose Mercury News, the Court determined that the claim

had been exhausted (docket no. 47).  On May 24, 2006, an evidentiary hearing was

conducted on the ineffective assistance claim.  Petitioner called as witnesses at the hearing his trial counsel, Dennis Kazubowski, who testified as a hostile witness and Gregg Stutchman, who offered expert photogrammetry testimony in support of the ineffective assistance claim in the petition.  Respondent did not call any witnesses at the hearing.[1]

## PROCEDURAL BACKGROUND

On January 24, 2000, a judge in Santa Clara County Superior Court sentenced Petitioner to thirteen years in state prison after a jury found him guilty of robbery and he was found to have suffered a prior serious felony conviction and state prison sentence. The California Court of Appeal affirmed the judgment on August 22, 2001 and simultaneously summarily denied Petitioner's separately filed habeas petition alleging ineffective assistance of counsel.[2]  The Supreme Court of California denied a petition for review on November 14, 2001.  Petitioner filed a petition for review of his habeas petition in the Supreme Court of California, which was summarily denied on December 12, 2001.

Petitioner's federal habeas petition, filed in this Court on February 27, 2002, includes these two remaining claims: (1) that Petitioner suffered ineffective assistance of counsel as a result of result of his retained trial counsel's failure to adequately investigate his case; and (2) that the trial court erred in using CALJIC 17.41.1, which was structural error and requires reversal of the conviction.

---

[1]Based on a motion *in limine* filed by Petitioner, the Court ruled that Respondent's expert, William Krone, could not testify to certain biometric or statistical evidence proffered by Respondent, but did not preclude other testimony from this witness (docket no. 65).

[2]Prior to filing his habeas petition in the Court of Appeal, Petitioner had filed there a motion under seal seeking funds to retain an expert for the purpose of establishing evidentiary support for Petitioner's argument that counsel was ineffective for failing to offer evidence that the perpetrator of the crime was seven to nine inches shorter than Petitioner.  This application was denied.

2

**STANDARD OF REVIEW**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Id.* § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-04, 409 (2000).

Under AEDPA, it is error for a federal court to review *de novo* a claim that was adjudicated on the merits in state court.  *See Price v. Vincent*, 538 U.S. 634, 638-43 (2003) (reversing judgment of 6th Circuit granting habeas relief on *de novo* review where claims did not meet standards for relief under § 2254(d)(1)).  A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits.  *Barker v. Fleming*, 423 F.3d 1085, 1092 (9th Cir. 2005); *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  Although an evidentiary hearing might be evidence of an adjudication on the merits, it is a sufficient, rather than a necessary, condition to AEDPA deference. *Id.* at 970.

Under AEDPA, challenges to purely legal questions resolved by the state court are reviewed under § 2254(d)(1); the question on review is (a) whether the state court's decision contradicts a holding of the Supreme Court or reaches a different result on a set of facts materially indistinguishable from those at issue in a decision of the Supreme

Court; or (b) whether the state court, after identifying the correct governing Supreme Court holding, then unreasonably applied that principle to the facts of the prisoner's case. *Lambert*, 393 F.3d at 978.[3]

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412; *Barker*, 423 F.3d at 1093 ("clearly established" federal law determined as of the time of the state court's last reasoned decision). The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court. *Williams*, 529 U.S. at 391 (referring to case-by-case analysis applicable to ineffective assistance of counsel claims).

In deciding whether the state court's decision is contrary to or an unreasonable application of clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson,* 217 F.3d 663, 669 n.7 (9th Cir. 2000). Habeas relief is warranted, however, only if the constitutional error at issue had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 121 S. Ct. 1910, 1920 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). With regard to Petitioner's jury instruction claim, the Court has reviewed the decision of the California Court of Appeal.

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. In such a case, an independent review of

---

[3]Both prongs of § 2254(d)(1) apply to questions of law and mixed questions of law and fact. *See Van Tran*, 212 F.3d at 1150.

the record is the only means of deciding whether the state court's decision was objectively reasonable.  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir. 2002); *Bailey v. Newland*, 263 F.3d 1022, 1028 (9th Cir. 2001); *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

The federal court need not otherwise defer to the state court decision under AEDPA: "A state court's decision on the merits concerning a question of law is, and should be, afforded respect.  If there is no such decision on the merits, however, there is nothing to which to defer."  *Greene*, 288 F.3d at 1089.  However, "while we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law."  *Fisher v. Roe*, 263 F.3d 906, 914 (9th Cir. 2001).  As the Ninth Circuit held in *Delgado*,

> Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law. . . .Only by that examination may we determine whether the state court's decision was objectively unreasonable.

223 F.3d at 982 (citation omitted).

## FACTS RELEVANT TO INEFFECTIVE ASSISTANCE CLAIM

The Court has reviewed the entire state court record, including the transcript of Petitioner's trial and appellate court record; the submissions of the parties; as well as the evidence from the evidentiary hearing.  It has also observed the demeanor of the witnesses as they testified in the evidentiary hearing and finds the following material facts:

### I.    Material Facts from State Court Proceedings

At approximately 1:45 a.m. on the morning of October 25, 1998, a 7-11 store in Milpitas was robbed by a masked assailant.  The robbery was captured on videotape.  In March 1999, Petitioner was arrested for the October 25, 1998 robbery. On May 19,

1999, Petitioner retained Dennis Kazubowski to represent him on the charge.  Mr. Kazubowski remained Petitioner's attorney throughout the criminal trial.  Joint Pre-Trial Stipulation: Procedural Facts ("Joint Pre-Trial Pro. Stip."), No. 5.

A preliminary hearing was held on August 4, 1999, and on August 13, 1999, the Santa Clara County District Attorney filed an information charging Petitioner with the 7-11 robbery and further alleged that he had a prior serious felony conviction, for which he had served a prison term, and which also constituted a "strike" under California law. *Id.*  Petitioner pled not guilty.  Joint Pre-trial Stipulation Facts from State Trial Court, "Joint State Trial Stip. No. 4.

Petitioner's trial commenced on December 3, 1999, and ended on December 9, 1999.  On December 7, 1999, Petitioner's jury convicted him on the robbery charge and on December 8, 1999, Petitioner admitted the truth of the prior serious felony conviction ("strike") and the prior prison term allegation.  On January 24, 2000, the trial court sentenced Petitioner to 13 years in state prison.  Joint Pre-Trial Pro. Stip. Nos. 4-6.

At trial, Mr. Kazubowski made an opening statement in which he told the jury Petitioner was not the masked robber.  Joint State Trial Stip. No. 6.  The state called three witnesses in its case-in-chief: store clerk Maria Lomeli, store manager Richard Salet and investigating officer Eric Emmanuele.  Both Emmanuele and Salet knew Petitioner since they all were in school together.  *Id.*, No. 25.  Maria Lomeli was the only eyewitness to the robbery who testified at trial.  She had worked at the store as a cashier.  At the time of trial Lomeli no longer worked at the store.  According to store manager Richard Salet she was fired for "repeated shortages" in her cash register, though he could not say how many.  Lomeli agreed she had been fired for being short on money in her cash register.  *Id.* Nos. 6-9.

Within a few minutes of the robbery, Lomeli called the police and Richard Salet, the manager of the 7-11.  Reporter's Transcript ("RT") at p. 46, lines 11-25.  After

Lomeli called, Salet and the police arrived, but Lomeli could not remember who arrived

first. *Id.* at p. 68, lines 14-21.  Lomeli spoke with investigating officer Emmanuele

immediately after the robbery.  Lomeli told officer Emmanuele that at 1:45 in the

morning of October 25, 1998, she was working at the 7-11 in Milpitas.  She was standing

with her back to the store cash register doing paperwork when she heard a noise behind

her.  She turned to see a black masked assailant jumping over the counter.  Lomeli

testified that she also told Emmanuele that after the suspect jumped the counter he

grabbed her by the left arm, pushed her hard, had an object in his right hand, and said

"open the register."  Joint State Trial Stip., Nos. 10-11.

Neither Salet nor Emmanuele witnessed the robbery. *Id.*, No. 23.  However,

Emmanuele, Salet and Lomeli viewed the videotape of the robbery taken by a camera

within the 7-11 together after Salet and Emmanuele arrived there.  RT at p. 48, lines 9-15

and p. 51, lines 1-3.  Evidence was admitted at trial of the viewing of the videotape by

each of these three witnesses in the 7-11 after the robbery. *Id.*; *id.* at p. 79, lines 8-12 and

p. 97, lines 16-23.

During the testimony of Lomeli, the videotape of the robbery was played for the

jury. *Id.* at p. 48, line 16, et. seq.  At approximately 1:45:45 a.m. on the counter on the

videotape, a robber wearing a stocking over his face is seen running into the store from

an angle to the right, entering and jumping over the counter.  The image of the face on

the video is obscured by the stocking mask.  Immediately thereafter, three people are

seen leaving the store through the door, walking past the white height tape marking

across which there appears to be several lines.  After some time passes, at 1:46:02-06

a.m. on the counter, the masked assailant, who is dressed in black pants and jacket and

appears to be shirtless and shoeless, is again seen jumping over the counter and running

out the door past the white height tape marking.  (Docket No. 31.)

According to Emmanuele, when Salet viewed the stilled videotape of the masked

robber, he said he was "positive" it was Petitioner.  Joint State Trial Stip., No. 26.  Upon viewing the paused videotape, Salet said "I think it's – That's Mike Hutchinson.  That's Money Mike."  RT. at p. 98, lines 18-21.  At the time they viewed the videotape, there was a conversation about the fact that the suspect was not wearing shoes.  *Id.* at p. 103, lines 13-17.  During that discussion, Emmanuele testified that Salet remarked that Petitioner "had an expensive pair of Air Jordan shoes" in the context of discussing that the robber had no shoes.  *Id.* at lines 18-20.  Salet later explained his comments about why the suspect was shoeless, saying that he "may have had a speculation why(.)" *Id.* at p. 81, lines 9-16.  There was no testimony elicited on direct or cross about the fact that the suspect was also wearing no shirt.

At trial, Salet said that he "believed" the videotape showed Petitioner, although he admitted that the picture quality was not good and he could not see any facial features.  Joint State Trial Stip. No. 27.  On cross-examination he testified, "(y)eah, you couldn't see the face, basically, at all."  RT at p. 85, line 8.  Emmanuele testified on direct examination that upon viewing the videotape he thought it "looked like it could have been him(.)"  At trial, the following exchange occurred during cross-examination of officer Emmanuele by defense counsel:

Q:      Did you form – after viewing the video tape, were you 100 percent certain who was on the video tape?

A:      Yes.

Q:      Are you to this day 100 percent sure?

A:      No

Q:      You believe it could be Mr. Hutchinson, is that correct?

A:      Possibly, yes.

Q:      Possibly?

A:      Possibly.

1    Q:    You don't know – you won't sit here and say, "I know that's him."

2    A:    No.

3    Q:    You won't say, "I know he's the one that robbed the 7-11?"

4    A:    No.

5    Joint State Trial Stip. at 28.

6    After the three viewed the videotape, Emmanuele put together a six picture

7    photographic lineup.  Lomeli picked out Petitioner's picture from the photo array.  *Id.*

8    No. 12.

9    At the trial in December 1999, Lomeli testified that prior to the robbery, she saw

10   Petitioner outside the store and she watched through the front window of the store as he

11   put a nylon over his head and then came inside the store.  Lomeli testified that the

12   masked robber was six feet tall.  At trial, Lomeli identified Petitioner as the masked

13   robber.  *Id.* Nos. 14-16.

14   Lomeli did not recall whether she had previously told Emmanuele that she saw the

15   masked assailant through the store window before the robbery pulling a nylon mask over

16   his head.  When defense counsel showed her a copy of Emmanuele's report of her

17   statements to refresh her recollection as to whether she had told Emmanuele this, she

18   said her recollection was not refreshed.  When Emmanuele was asked if Lomeli had told

19   him this, he said "[n]ot that I can remember." *Id.* No. 13.

20   Petitioner offered into evidence a poster with a picture of Petitioner in it

21   advertising his services as a pastor.  RT at p. 87, lines 6-9.  The prosecution elicited

22   testimony that at times when Lomeli was working, the window of the 7-11 had a copy of

23   the poster with Petitioner's picture.  Emmanuele testified that he knew this poster had

24   been in the front window of this 7-11 store.  Lomeli testified that she could not

25   remember ever seeing the poster in the store.  Neither Salet nor the police could find a

26   copy of the poster in the store after the robbery.  *Id.*  Nos. 17-20.

27

28
                                               9

Although this evidence was offered into evidence by Petitioner, the record does not show any explanation of its significance to the jury. The only reference to it by Kazubowski was a brief argument in his summation that there was no explanation for why Petitioner wasn't arrested for so many months, given the existence of the poster. RT at p. 228, lines 1-5.

Lomeli testified that she had served Petitioner previously at the store on a few occasions although she could not remember exactly how many times. Lomeli testified that she recognized Petitioner's voice and that Petitioner had told her on one prior occasion that his name was "Mike." *Id.* Nos. 21-22.

Kazubowski presented an alibi defense at Petitioner's trial. Evidentiary Hearing Transcript ("EHT") at p. 17, lines 15-17; p. 29, lines 5-21. Kazubowski called Petitioner as the sole witness in his own defense. Joint State Trial Stip. No. 29. Defense counsel asked Petitioner if it was him on the videotape. Petitioner testified that it was not him on the video and that he did not rob the store. *Id.* No. 30. When questioned about where he was on the night that the robbery occurred, Petitioner testified that he did not know where he was, stating, "I can speculate." RT at p. 131, line 19. As a result of testifying, Petitioner was cross-examined about his prior criminal conviction and state prison sentence for assault with a deadly weapon, *id.* at p. 137, line 10 to p. 138, line 6, an open arrest where he was accused of burglary of his wife's house, spousal abuse and assault with a deadly weapon. *Id.* at p. 139, line 18 to p. 141, line 16, and a prior domestic violence misdemeanor battery conviction, p. 141, line 17 to p. 142, line 28.

Petitioner testified that both of his hips had been broken and his leg was broken in three places and that, because of his injuries, he could not have jumped over the counter, as occurred in the 7-11 robbery. *Id.* at p. 135, line 3 to p. 136, line 9. No medical evidence or witnesses were offered in support of this aspect of Petitioner's defense. *Id.* at p. 185, lines 4-5. The prosecutor cross-examined Petitioner about how his condition

wasn't too impaired to engage in the conduct underlying his convictions and arrest, *id,* at p. 137-142, and argued in summation that there was no independent medical evidence before the jury supporting Petitioner's testimony, "Well, the problem is you never heard from a doctor that provided a diagnosis as to the defendant's condition." *Id.* at p. 220, lines 1-14.

Emmanuele testified that petitioner was 6'2". The booking report of petitioner's arrest states that petitioner is 6'1". Joint State Trial Stip. No. 33. During his closing argument, the prosecutor noted that the photographic lineup put together by police also listed petitioner as 6'2" tall. *Id.,* No. 34. Police arrested Petitioner in March of 1999, more than four months after the crime. *Id.,* No. 31.

No physical evidence connected Petitioner with the crime scene. A palm print that was taken from the counter of the 7-11 was found to be "unidentifiable" which means that "it didn't come back with a match to a suspect." RT at p. 119, lines 17-27. Other than the identification testimony, there was no evidence linking Petitioner to the crime.

In summation, the prosecutor argued from the factors in the jury instruction regarding eyewitness identification that Lomeli had properly identified Petitioner as the perpetrator of the crime. He argued that she had ample opportunity to observe the robber; her stress level at the time of the initial observation had been low; the stress of the robbery may have caused her to remember better; and her ability to make an identification was good. He further argued that her prior contacts with Petitioner supported her identification and that she was confident of her identification. The prosecution further argued that Petitioner presented no medical evidence to support his assertion that his injuries would have prevented him from jumping over the counter and that his testimony was contradicted by the evidence of his criminal cases.

Kazubowski argued in summation that it did not make sense for Petitioner to

11

commit a crime in a location where he was known and that Lomeli's identification was not reliable and that her testimony should not be credited.  While Kazubowski touched on the suggestiveness inherent in the identification of Petitioner by Lomeli after the simultaneous viewing of the video by which Salet identified Petitioner as being the masked robber,[4] he did not explain how Salet's assertion that he was "positive" and his speculation of the reason the suspect was shoeless, may have impacted on Lomeli's identification of Petitioner or her confidence therein.[5]  He further argued that the failure to arrest Petitioner for the crime for six months did not make sense and that the identification of Petitioner by Salet on the videotape was not believable.  RT at p. 229, line 17.

In Petitioner's state habeas petition, which was made a part of his federal petition, Petitioner alleged that counsel's investigation of the scene and failure to offer evidence from the scene and expert testimony regarding the height of the suspect depicted on the videotape constitutes ineffective assistance of counsel.  *See*, *Respondents Exh. E*.  In the state petition, counsel's appellate attorney, Robert Wayne Gehring, attached a sworn declaration in support of the petition, dated May 16, 2001.  His state habeas petition, filed in the Sixth Appellate District, argued that trial counsel did not offer evidence at trial that would have showed that the perpetrator of the crime was not the same height as Petitioner as set forth below:

> No still photographs made from the tapes were introduced at trial.  The defense counsel did not introduce the photographs he had made before the trial. (R. T. p. 13.) No evidence was entered as to the height markings on the door of the 7-11.  No evidence was introduced as to the height of the perpetrator seen in the videotape.  The failure to obtain and introduce

[4]*see, e.g.*, *United States v. Bagley,* 772 F.3d 482, 494 (9th Cir, 1985) (finding a joint identification to be a "disapproved identification procedure); *see also, Neil v. Biggers, 409* U.S. 188, 199 (1972).

[5]The Court cannot determine from the record before it whether there was any pre-trial motion to suppress the in-court identification of Petitioner by Lomeli.

such evidence is ineffective assistance of counsel.

*Id.* at 9.

In his declaration in support of the petition, Gehring declares that there are two black lines on the white tape marking on the door that measure 5 and 6 feet from the floor. He further declared that by measuring the angles between the video camera, the floor and the door, one could determine that the suspect in the video was "no more than 5'5" and 5'6" in height." *Id.* at 24.

The declaration also documents his conversation with trial counsel Kazubowski, who informed him that his failure to introduce the photographs was due to their poor quality and that his belief that Petitioner lacked funds to hire an expert to determine the height of the suspect was the reason he did not have the video analyzed. Kazubowski further informed counsel that he was not ready for trial, but that he had been sent out to try the case nonetheless. *Id.* at 24-25.

Appellate counsel had also sought funds in the Court of Appeal to provide an expert evaluation of the videotape in support of the petition. In support of that application, counsel attached a letter and the curriculum vitae of an expert, Dr. Riadh Munjy. a Professor of Engineering at California State University, Fresno, who was available to conduct the investigation. However, no funds were provided by the Court of Appeal and Petitioner could offer no such evidentiary support for his claim.

## II.   Material Facts From Evidentiary Hearing

### A.   Availability of Expert Testimony to Establish the Height of the Perpetrator in the Video

Expert witness Gregg Stutchman first became involved in Petitioner's case when he was contacted by reporter Rick Tulsky of the San Jose Mercury News, who was doing a study of the criminal justice system in Santa Clara County's lower and appellate courts. Tulsky requested Stutchman to conduct an analysis of whether the suspect in the video could have been 6'1" or 6'2". EHT at p. 57, line 3-4. The report for the Mercury New

first came to this Court's attention when Petitioner and Respondent made it an Exhibit to the Joint Case Management Conference Report (docket no. 32).

Gregg Stutchman subsequently testified at the evidentiary hearing before this Court as an expert in photogrammetry. Photogrammetry is the technology of obtaining reliable information, including physical dimensions, about physical objects in photographic images. *Id.* Nos. 10-11. At the time of the criminal trial in this case, testimony from a photogrammetrist estimating the height of a suspect based on a still photograph taken from a surveillance video was both available and admissible in California. Joint Stipulation: Post-conviction Facts, ("Joint Post-con Stip."), No. 1.

Stutchman conducted an evaluation of the person depicted in the video in this case, using photogrammetry. Stutchman was asked by Petitioner to render an opinion of the height of the suspect on the robbery video from the 7-11 robbery. EHT page 72, line 15-17. In April 2006, Stutchman examined the surveillance video identified as Trial Exhibit 1 and captured and produced seven still photographs from it. *Id.* at p. 57, lines 21-22. The still photographs described in Appendix I were accurately captured from the surveillance videotape. Joint Post-con Stip., No. 6.

These photographs show the perpetrator of the robbery entering and leaving the 7-11. Stutchman selected the seven photographs he evaluated because they show the suspect closest to the object of known dimension in the videotape, which was the height tape on the door of the 7-11. Stutchman used the photos where the suspect was closest to the door, either inside or outside of the store. EHT at p. 57, lines 21-22; Joint Evidentiary Hearing Stipulation, ("Joint EH Stip."), No. 13. Stutchman also selected the seven photos because they showed the perpetrator in a full cycle of his stride. *Id.* , No. 14.

The distance from the camera lens to the floor of the 7-11 store in Milpitas is 9'3". The distance from the front door of the Milpitas 7-11 to the point on the floor

14

directly below the surveillance camera is 26'6". The height tape on the door of the 7-11 begins at 4'6" and ends at 6'6". These measurements were the same at the time of the robbery. Joint Post-con. Stip Nos. 2-5.

In testimony regarding the forensic evaluation conducted in this case, Stutchman testified to the use of the terms "apparent height," "location adjustment," and "adjusted height" and their definitions, which were stipulated to by the parties. *Id.* No. 6.

Because of the angle of the surveillance camera, the apparent height of a person who is inside the store will be less than his adjusted height. Conversely, the apparent height of a person who is outside the store will be greater than his adjusted height. *Id.* Nos. 7-8. The location adjustment accounts for this factor, by adding or subtracting from the apparent height of the depicted person to correct for their location in relation to the door of the 7-11. When the relevant location adjustment is added to or subtracted from an apparent height, it results in an adjusted height. The adjusted height reflects a height for the person in the photograph as that person would appear next to the height tape in the same posture as he appears in the photograph. *Id.* No. 18. The parties further stipulated to location adjustments for the position of the suspect relative to the door in the photographs that were used to conduct the evaluation in this case.[6] *Id.* Nos. 11-17.

---

[6]By this stipulation, Respondent did not stipulate to the accuracy of Stutchman's view of the subject's apparent height or his estimation of distance he claims the suspect is located either inside or outside the door. The location adjustments described above were suggested by Assistant District Attorney Ed Fernandez in a letter to Stutchman dated January 12, 2004. They were thereafter computed by habeas counsel and Stutchman, and were corroborated by Stutchman's photogrammetry study using Petitioner's counsel, Cliff Gardner, as a model. Calculations were based on elementary geometric principles in Fernandez's January 12, 2004 letter. The theorems included the Pythagorean theorem and the theorem of similar right triangles. These theorems were used because the geometry of the scene involved similar right triangles. The figures were also corroborated by William Krone's figures derived from plotting locations and angles on graph paper.

The seven photographs analyzed by Stutchman were admitted into evidence as Exhibits 8-14. Stutchman used a computer program to document where on the photos offered in evidence the height measurements for 4'6", 5'0", 5'6", 6'0" and 6'6" fall. *Id.* at p.61 line 14 through p. 62, line 2. Stutchman used a parallel ruler to determine the suspect's apparent height, by lining the bottom ruler across the bottom of the doorway and raising the top ruler to the top of the head of the suspect. *Id.* at p.62, lines 11-15. Stutchman then drew a horizontal red line from the height tape to the top of the perpetrators head, using a computer program, then double-checked this line manually. *Id.* at line16 through p.63, line 4. Double-checking manually was necessary because the program will automatically draw a line that is parallel to the bottom of the photo, not to the depicted image. *Id.* at p. 62, lines 21to page 63, line 4. Using the parallel ruler, Stutchman found the apparent height of the suspect in each of the exhibits to be as follows: Exhibit 8: 5'3"; p. 74, line 3; Exhibit 9: 5'5"; Exhibit 10: between 5'4" and 5'5"; Exhibit 11: 5'1"; Exhibit 12: 5'3"; Exhibit 13: 5'3"; and Exhibit 14: 5'7".

In Exhibit 8, Stutchman marked the top of the suspect's head by measuring the suspect's eye sockets as midway between the chin and the top of his head, which is where they fall on a person's head. *Id.* at p.64, lines 7-14. Stutchman used this method of measuring because the suspect is wearing a stocking cap which protrudes above the top of his head. *Id.* at p.64, lines 12-18.

Stutchman also conducted an "empirical study" using a person of known height (6'1") and a camera with the same focal length and position as the one which captured the photos of the suspect to confirm the appropriate "location adjustments" with regard to his evaluation of these video stills. EHT, at p. 67, line 13-24.

Stutchman used the width of the rug inside the 7-11, (which 43 ½" inches wide) to estimate how far inside or outside the door the suspect in the pictures was. *Id.* at p. 71, lines 14-19. Stutchman testified that a mistake of 6" in the estimation of the location

would make very little difference in his assessment of the height of the perpetrator, of "one inch at the very most." *Id.* at p. 75, line 21.

After employing the "location adjustment," Stutchman found the adjusted height for the suspect in each of the exhibits in evidence to be as follows: **Exhibit 8:  5'; Exhibit 9 is 5'1 ½"; Exhibit 10 is 5'6"; Exhibit 11 is 5'4 ½"; Exhibit 12 is 5'6 ½"; Exhibit 13 is 5'6 ½"; and Exhibit 14 is 5'3 ½".**   Stutchman attributes the variation in the adjusted height of the suspect found in the different pictures (the shortest measurement of the suspect's height being 5' and the tallest 5'6 ½") to be attributable to where the suspect was in his stride in the different captured images. *Id.* at p. 77, line 16-17.

Stutchman testified that comparable technology was available to analyze images on a videotape in 1999.  EHT at p. 92, line 20 to p. 93, line 8.  This Court credits the testimony of Stutchman, who was credible and whose testimony was very persuasive, regarding the expert testimony available at the time of Petitioner's trial to establish that the suspect depicted in the photographs derived from the videotape was significantly shorter than Petitioner.

**B.     Investigation by Trial Counsel Dennis Kazubowski**

Trial counsel Kazubowski was privately retained by Petitioner and there were no monetary restrictions placed on him. Joint Evidentiary Hearing Stipulations ("Joint EH Stip.") No. 1.  Kazubowski testified that he investigated Petitioner's alibi defense, but that neither his mother nor his wife could provide him with an alibi.  EHT at p. 35, lines 4-17.

Kazubowski received a copy of the videotape of the robbery.  Kazubowski reviewed the videotape before trial and generated six photos from it.[7]  Kazubowski did

---

[7]Although one of these photos is part of this record, Docket No. 27, the other five photos in defense counsel's possession at the time of trial were not offered into evidence.

not offer into evidence at Petitioner's trial any of the six still photographs in his possession printed from the videotape. Kazubowski and Petitioner viewed the photos from the video together. Kazubowski had reviewed the police report of the crime with Petitioner before they viewed the photos together. Kazubowski had in his trial file Trial Exhibits 5, 6, and 25. *Id.* Nos. 2-7. These documents relate to the referral by Petitioner's previous attorney for an assessment of Petitioner's competence; a report that Petitioner would not answer questions and may not be competent to stand trial; and the police report in this case, respectively.

Kazubowski did not pursue expert evidence to investigate the height of the robber in the videotape. Kazubowski knew of the existence of experts to analyze videotapes, though he did not know it was called "photogrammetry." EHT at p. 41, line 25 through page 42, line 2. Kazubowski knew that he would not be required to present any expert evidence that he obtained to the jury or turn it over to the prosecution, if he did not intend to introduce it. Joint EH Stip Nos. 8-9.

One reason Kazubowski testified to for not having the videotape analyzed was that he believed "there was no doubt that that was Michael" *Id.* at p. 42, line 13. Kazubowski repeatedly testified that he believed that the video depicted Petitioner, saying "(a)s I told you many times. . .I didn't want to hire an expert to have an expert tell me that it was Michael." *Id.* at p. 31, lines 11-14; p. 29, lines 12-15. Kazubowski also testified that he believed an expert might conclusively identify Petitioner as the person depicted in the video. *Id.* at p. 31, lines 11-14; p. 32, lines 10-21. Counsel did not have the evaluation done before coming to this conclusion. Kazubowski testified further that he believes that if he called an expert to evaluate the height of the suspect in the videotape, the prosecution would do the same.[8] *Id.* at p. 30, lines 8-25. Kazubowski

---

[8]Although Kazubowski testified as such, he also testified that he did not consider such an expert. *Id.* at p. 45, lines 21-25.

18

further testified that Petitioner did not inform him that the person in the video was shorter than he. *Id.* at p. 34, lines 4-7; p. 39, lines 3-7; p. 45, lines 18-25.[9]

Kazubowski testified that he and Petitioner made a "tactical decision to use the alibi defense." *Id.* at p. 29, lines 10-11. However, Kazubowski conceded that he had not investigated the issue of height. *Id.* at p. 31, lines 15-17.

Kazubowski did not use the photographs as a basis for cross-examining any of the witnesses or make any arguments regarding the height of the perpetrator depicted in the video. Kazubowski testified that though the videotape came into evidence, he could not recall presenting any evidence to respond to the impact of the videotape, other than Petitioner's testimony. *Id.* at p. 43, lines 7-10.

Kazubowski testified that he was aware that some banks and convenience stores have height markings on the door to help identify the height of the perpetrator of a robbery. *Id.* at p. 45, lines 4-5. Kazubowski testified that he did not recall seeing the white height tape on the door of the 7-11, either when he visited the scene or in photographs.[10] When asked by the court whether he had seen a photograph of the scene which showed a white tape on the door of the 7-11, Kazubowski answered "I don't believe so, your Honor." *Id.* at p. 43, line 23 to p. 44, line 6. Kazubowski also testified that when he looked at the photos he had generated from the video, he did not see anything that led him to believe the robber was shorter than Petitioner. *Id.* at p. 34, lines 8-11.

## C.   Factual Finding Regarding Credibility of Kazubowski

In determining the issues before it, this Court finds that trial counsel Kazubowski was not a credible witness. Kazubowski was not forthright, he was unable to remember

---

[9]When Petitioner's counsel questioned him about whether P had any programmetry experience, he stated "He may have. I don't know". *Id.* at p. 39, lines 8-15.

[10]However, Kazubowski testified in response to Petitioner's counsel's question about whether he had measured the height tape on the door, "I don't recall." EHT, at p. 25, line 21.

many important details regarding his representation of Petitioner, (*ie*, "I don't recall one thing I told the jury(.)" EHT, at p. 21, lines 5-6), and appeared to be quite selective in his memory of his representation of Petitioner.  For example, even on an insignificant detail such as whether he had himself taken pictures of the crime scene, when asked about this by Petitioner's counsel, Kazubowski said that he could not recall whether he took photos of the scene, EHT, p. 25, lines 18-19, but when asked later by the Court about the same fact, he readily answered that he had not.  *Id.*, at p. 43, line 17.  Later, on a more central issue, when asked by Petitioner's counsel whether he discussed obtaining an expert evaluation of the videotape to determine the height of the perpetrator, Kazubowski testified, "I do not recall if that was a specific conversation that we had or not." *Id.,* at p. 30, lines 3-7.  However, when asked by the Court the very same question, counsel answered, "No. That never came up.  When we looked at it and looked at the photos, nobody ever said, (")hey, that guy's too short or he's too tall.(") That was never a discussion between my client and I." *Id.* at p. 45, lines 21-25.

Moreover, in this Court's assessment, his tone and demeanor during questioning by Petitioner's counsel appeared defensive, argumentative, and hostile.  When asked questions about whether he would have offered exculpatory evidence in support of Petitioner's defense regarding the perpetrator's height if he had been aware of it, Kazubowski refused to answer the questions, stating,  "(w)ell, you're asking a hypothetical that didn't happen, so I don't know how you want me to answer that(,)" p. 28, lines 1-6, and in response to the question, "If there was a witness, you would have.  Fair?" he answered, "No, not fair. It's a hypothetical that I can't answer." *Id.* at p. 28, line 25 to p. 29, line 1.  While clearly an attorney who is called to testify regarding a claim of ineffective assistance involving his own conduct is in a difficult position, counsel Kazubowski's testimony at this hearing appeared biased.

Kazubowski also seemed to justify his failure to investigate in this case on

Petitioner's confession of guilt, and when Petitioner's counsel tried to establish that Petitioner had not admitted his guilt before the conclusion of trial, Kazubowski testified repeatedly that he could not remember when Petitioner admitted to him that he committed the crime. *Id.* at p. 21, lines 18-20; p. 24, lines 4-12. Kazubowski eventually conceded that he would not have offered Petitioner's testimony that he did not commit the crime if he had known it to be perjury. *Id.* at p. 21, lines 11-17; p. 23, lines 16-22. Further, in response to questions regarding his investigation, he repeatedly testified that he and Petitioner made a "tactical decision" not to pursue an analysis of the videotape, while simultaneously testifying that he had not investigated what such an investigation would have uncovered.[11]  *Id.* at p. 29, line 5 through p. 31, line 17.

Although Kazubowski testified that he has had many clients and trials in the years since Petitioner's trial, he appeared unwilling or unable to refresh his memory regarding the relevant facts of this case. During direct examination, Kazubowski answered "I don't recall" to many, if not most, of the questions asked of him and when Petitioner's counsel attempted to refresh his recollection with prior testimony or documentation from the case, he repeatedly testified that his recollection had not been refreshed. *See, e.g., id.* at p. 11-18; p. 20, lines 12-17; p. 21, lines 5-6; p. 23, lines 11-15.[12]  A witness' inability to remember most of the important facts about which he testifies is certainly an essential factor in assessing their credibility. As such, neither his recollection nor his credibility

---

[11]It is well-settled criminal law that attorney decisions that are "strategic" in nature are accorded greater deference than other actions that might constitute ineffective assistance of counsel ("(S)trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 508 (9th Cir. 1994) (citation omitted)) . By repeatedly asserting that Petitioner and he agreed on this particular strategy, while simultaneously refusing to remember the relevant details, counsel appeared to be tailoring his testimony for the purpose of shielding his own conduct and assisting the Respondent, rather than testifying candidly regarding his recollection of the circumstances of this case.

[12]Kazubowski even appeared unwilling to identify his own handwriting on the police report from Petitioner's file in this case. EHT at p. 13, lines 16-20.

1  can be credited here.  *C.f.* 9th Cir. Civ. Jury Instr. 3.6 (2002) (credibility of witnesses).

2  ## ANALYSIS OF INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

3       Petitioner argued in his habeas petition before the Court of Appeal and here that

4  counsel was ineffective for failing to adequately investigate and offer evidence from the

5  videotape which he contends would have established that there was a significant height

6  disparity between the perpetrator of the robbery and Petitioner.  Petitioner asserts that

7  counsel's failure to offer evidence from the scene and expert testimony to establish a

8  significant height disparity between Petitioner and the person who committed the robbery

9  violated his Sixth Amendment right to effective assistance of counsel.

10      The California Court of Appeal summarily denied the ineffective assistance claim

11 without an evidentiary hearing on Petitioner's claim of ineffective assistance of counsel

12 or issuing a reasoned opinion addressing the merits of the claim.  The California

13 Supreme Court also denied the petition for review without issuing a reasoned opinion.

14      A summary denial of the petition constitutes a decision on the merits under

15 2254(d).  *See, Greene*, 288 F.3d at 1088.  However, as there is no decision of the state

16 courts addressing the merits of this claim, this Court has reviewed the record as a whole

17 with regard to the ineffective assistance of counsel claim to determine whether the state

18 court's decision was objectively unreasonable, *Bailey,* 263 F.3d at 1028.

19      After reviewing the record as a whole, the focus turns to "whether the state court's

20 resolution of the case constituted an unreasonable application of clearly established

21 federal law."  Fisher v. Roe, 263 F.3d 906, 914 (9th Cir.2001).  In order to grant the

22 petition, this Court must also determine that the state court's rejection was not just

23 erroneous, but objectively unreasonable. *Delgado,* 223 F.3d at 981.

24 I..   <u>Applicable Law</u>

25      A claim of ineffective assistance of counsel is cognizable as a claim of denial of

26 the Sixth Amendment right to counsel, which guarantees not only assistance, but

27

28

effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).
The benchmark for judging any claim of ineffectiveness must be whether counsel's
conduct so undermined the proper functioning of the adversarial process that the trial
cannot be relied upon as having produced a just result.  *Id.*  The right to effective
assistance counsel applies to the performance of both retained and appointed counsel
without distinction.  *See Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim,
petitioner must establish two things.  First, he must establish that counsel's performance
was deficient, i.e., that it fell below an "objective standard of reasonableness" under
prevailing professional norms.  *Strickland*, 466 U.S. at 687-88.  Second, he must
establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a
reasonable probability that, but for counsel's unprofessional errors, the result of the
proceeding would have been different."  *Id.* at 694.  A reasonable probability is a
probability sufficient to undermine confidence in the outcome.  *Id.*

In a federal habeas challenge to a state criminal judgment, a state court conclusion
that counsel rendered effective assistance is not a fact binding on the federal court to the
extent stated by 28 U.S.C. § 2254(d).  Both the performance and the prejudice
components of the ineffectiveness inquiry are mixed questions of law and fact.  *See
Strickland*, 466 U.S. at 698.  Claims of ineffective assistance therefore require a review
of the record.

First, the defendant must show that counsel's performance was deficient.  This
requires showing that counsel made errors so serious that counsel was not functioning as
the "counsel" guaranteed by the Sixth Amendment.  *See Id.* at 687.[13]  The defendant must

---

[13] A habeas petitioner has the burden of showing through evidentiary proof that counsel's
performance was deficient.  *See Toomey v. Bunnell*, 898 F.2d 741, 743 (9th Cir.), *cert. denied*,
498 U.S. 960 (1990); *see also Rios v. Rocha*, 299 F.3d 796, 813 n.23 (9th Cir. 2002) (rejecting
two ineffective assistance of counsel claims based on petitioner's failure to produce evidence of

23

show that counsel's representation fell below an objective standard of reasonableness. *See id.* at 688. The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).

Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Wildman v. Johnson*, 261 F.3d 832, 838 (9th Cir. 2001) (finding no deficient performance by counsel who did not retain a ballistics expert on a menacing charge where the same expert had been used in the successful defense of the same defendant on a felon-in-possession charge); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

The reasonableness of counsel's decisions must be measured against the prevailing legal norms at the time counsel represented the defendant. *See Wiggins v. Smith*, 123 S. Ct. 2527, 2536-37 (2003) (citing American Bar Association professional standards and standard practice in capital defense at pertinent time); *Jennings v. Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002) (deficient performance where counsel who had settled on alibi defense failed to investigate possible mental defense despite state supreme court decision before trial that in such instances counsel is not excused from investigating the potential mental defense). It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if the petitioner cannot even establish incompetence under the first prong. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Williams*

---

prejudice).

*(Terry) v. Taylor*, 529 U.S. 362, 404-08 (2000).   Where the defendant is challenging his conviction, the appropriate question is "'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 695).  If the state's case is weak, the potential prejudicial effect of counsel's performance must be evaluated in light of that fact.  *See Johnson v. Baldwin*, 114 F.3d 835, 838 (9th Cir. 1997).  "'[P]rejudice may result from the cumulative impact of multiple deficiencies.'"  *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 974 (1979)).  In other words, in a case with various deficiencies, there may be a reasonable probability that, absent the various deficiencies, the outcome of the trial might well have been different.

Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances.  *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  However, when an attorney fails to examine potentially exculpatory evidence of which he was aware, the *Strickland* presumption that the failure is sound trial strategy is vitiated.  *See Jones v. Wood*, 114 F.3d 1002, 1011 (9th Cir. 1997).  Likewise, it was ineffective assistance to make the "tactical decision" to pursue an alibi defense before investigating the client's compelling history of mental infirmity and drug abuse. *Jennings,* 290 F.3d at 1016.  *But cf. Williams*, 384 F.3d at 611-612 (where counsel reasonably selected an alibi defense as the primary defense theory, counsel no longer had a duty to investigate a "conflicting" mental-state defense).

A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  *See*

*Strickland*, 466 U.S. at 691; *Avila v. Galaza*, 297 F.3d 911, 924 (9th Cir. 2002); *Turner v. Duncan*, 158 F.3d 449, 456 (9th Cir. 1998). *Strickland* directs that "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 491).   A claim of negligence in conducting pretrial investigation can form the basis for a claim of ineffective assistance. *See United States v. Tucker*, 716 F.2d 576 (9th Cir. 1983); *Hines v. Enomoto*, 658 F.2d 667, 676 (9th Cir. 1981).[14]  The investigation itself must be reasonable for an attorney's tactical decision based on that investigation to be reasonable. *Wiggins v. Smith*, 123 S. Ct. 2527, 2536 (2003) (tactical decision not to present life history as mitigating evidence in capital sentencing trial unreasonable where counsel failed to follow up on evidence that defendant had a miserable childhood).

In making this assessment, a court must consider not only the quantum of evidence known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Id.* at 2538.  Evidence that the challenged trial conduct resulted from inattention rather than from strategic considerations may also be relevant to the inquiry. *Id.* at 2537-38 (noting that counsel represented to the court and to the jury in opening statements that they would present a mitigation case based on defendant's difficult life; failure to present such evidence, therefore, likely resulted from inattention rather than strategic decision). *See, e.g., Rompilla v. Beard*, 125 S. Ct. 2456,

---

[14] *Franklin v. Johnson*, 290 F.3d 1223, 7829 (9th Cir. 2002) (failure to investigate the viability of a mental state defense was objectively unreasonable when counsel knew that defendant had been diagnosed with alcohol dependence and pedophilia, and had attempted suicide); *Hart v. Gomez*, 174 F.3d at 1068-69, 1071 (finding deficient performance where counsel failed to investigate and present documentary evidence corroborating testimony of a key defense witness whom the jury might otherwise not believe even though the witness explained what documents she had and their importance to the defense)

2462-69 (2005) (even when a capital defendant's family members and the defendant himself suggested that no mitigating evidence was available, his lawyer was bound to make reasonable efforts to obtain and review material that counsel knew the prosecution would probably rely on as evidence of aggravation at the trial's sentencing phase); *Avila*, 297 F.3d at 920 (holding that failure to present certain witnesses' testimony is not a valid strategic decision when attorney never investigated witnesses' background or what testimony they could provide); *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (counsel's decision not to present cumulative lay testimony on a mental state defense addressed by defense experts was not unreasonable).

The failure to investigate a defense may not be ineffective assistance where it was due to the defendant's failure to inform the attorney of relevant facts and insistence on a particular course of action. *See Langford v. Day*, 110 F.3d 1380, 1386-88 (9th Cir. 1997) (finding that an attorney's failure to discover that his client had initially refused to waive his *Miranda* rights not ineffective when defendant told him that he had been read his rights, waived them and confessed to the crime).  But counsel is not free to accept unconvincing denials from a defendant without some minimal investigation of the facts. *See Johnson v. Baldwin*, 114 F.3d 835, 835-40 (9th Cir. 1997) (counsel's failure to investigate and discredit defendant's unconvincing denial that he was present at scene of alleged crime fell outside range of competent assistance because it deprived defendant of other defenses); *cf. Phillips v. Woodford*, 267 F.3d 966, 978-80 (9th Cir. 2001) (no deference to counsel's decision not to investigate any defense other than the implausible alibi story offered by defendant which even counsel did not believe).  "[A]n attorney who fulfills his or her duty to investigate the facts of a case may discover and need to act upon information contrary to that which the client has furnished." *Johnson*, 114 F.3d at 840.

A trial attorney has wide discretion in making tactical decisions, including abandoning inconsistent or unsupported defenses, *see Correll v. Stewart*, 137 F.3d 1404,

27

1411-12 (9th Cir. 1998); *Turk v. White*, 116 F.3d 1264, 1267 (9th Cir. 1997); *United States v. McAdams*, 759 F.2d 1407, 1409 (9th Cir. 1985).  Nevertheless, the label of "trial strategy" does not automatically immunize an attorney's performance from Sixth Amendment challenges.  *See United States v. Span*, 75 F.3d 1383, 1389-90 (9th Cir. 1996).

To determine prejudice in a case where counsel failed to make a reasonable investigation to support a tactical decision, the Supreme Court considered whether a reasonable attorney would have made a different tactical decision if he had conducted a reasonable investigation, *Wiggins v. Smith*, 539 U.S. 510, 536-38 (2003), and whether there was a reasonable probability that the jury would have reached a different verdict had the attorney pursued the alternative strategy, *id.* at 536.  In making the latter determination, a reviewing court must evaluate the totality of the evidence, both the evidence adduced at trial and the evidence adduced in the habeas proceedings.  *Id.; see, e.g., Rompilla*, 125 S. Ct. at 2467-69.

II.   Analysis

This Court's examination of the record is hindered by the failure of the state court to provide a rationale for its decision.  *Delgado,* 223 F.3rd at 981.  As the Ninth Circuit has noted, the lack of a reasoned decision impedes this Court's ability to determine whether the state court has conducted the analysis required under *Williams,* namely whether it has "correctly identify(ied) governing legal rules, but appl(ied) it unreasonably to a factual situation."  *Id.*  Therefore, in reviewing the record as a whole, this Court must determine whether the Court of Appeal's determination to deny the habeas petition alleging ineffective assistance based on Kazubowski's failure to investigate and present evidence was an unreasonable interpretation of *Strickland*.

In reviewing the record as a whole, this Court considered how, if at all, the height evidence fits in with the defense of Petitioner offered at trial.  Petitioner's defense of the

28

charges at trial included counsel's cross-examination of the witnesses regarding the identification of Petitioner, as well as admission of the poster of Petitioner's ministry and Petitioner's own testimony. Petitioner testified that he did not commit the robbery, but that he could not recall where he was at the time. Petitioner also testified that he could not have committed the crime due to his impaired physical condition. Petitioner's testimony opened the door to a lengthy cross-examination about prior criminal acts and an open domestic violence case and how his testimony about his physical impairments was inconsistent with his criminal conduct. There was no independent medical evidence to support his assertion that he could not have committed the crime, a fact argued by the prosecution in summation.

In support of his petition in state court, Petitioner provided sworn allegations that Kazubowski failed to introduce the pictures he had produced from the video because they were of poor quality and that he did not have the videotape analyzed by an expert because he believed Petitioner lacked funds to pay for the evaluation. There was also evidence before the Court of Appeal that Kazubowski stated that he was not prepared for trial when he was sent out to try Petitioner's case. Petitioner argued that the failure to offer evidence that the perpetrator was 7" to 9" shorter than Petitioner was ineffective assistance and that he was prejudiced by the omission.

This Court heard testimony from trial counsel Kazubowski regarding the circumstances surrounding his representation of Petitioner and his investigation of the case. At the hearing before this Court, Kazubowski offered competing justifications for his failure to have the videotape analyzed or offer the photos into evidence.[15] At one point, Kazubowski testified that he did not offer the photos because he believed they "quite clearly" depicted Petitioner. EHT, at p. 33, lines 10-12. This Court cannot credit this testimony when Kazubowski told appellate counsel in 2001 that he did not offer the

---

[15]See, finding regarding Kazubowski, *supra*.

29

pictures into evidence at trial because they were of poor quality and argued in summation to the jury that it was unbelievable that the witnesses could identify Petitioner from the video, from which the stills were produced. *See,* RT at p. 226, lines 15-16. Although only one of the photos produced by Kazubowski is before the Court, on this Court's viewing of the still, it cannot be said that there is anything that is "quite clear" about the image of the suspect depicted therein, sufficient to justify a failure to investigate further. *See also* Exhibits 8-14.[16]

Kazubowski alternatively offered that Petitioner failed to direct his attention to the evidence regarding the perpetrator's height. Even under the best of circumstances, a criminal defendant may not be able to properly view the significance of evidence against him in a criminal case. *See, e.g., Phillips,* 267 F.3d at 978-80. Additionally, in this case, Kazubowski knew of, or had available to him in his file, documentation that Petitioner's judgment or mental functioning may have been impaired. Exhibits 5 and 6.

At the hearing before this Court, counsel testified that he did not see anything in the still photos that led him to believe that the person in them was shorter than Petitioner. Kazubowski also testified that he knew that banks and convenience stores had such height tape markings for the purpose of helping identify robbers, but that he didn't see any such height markings on the photographs or videotape in this case. However, the white height tape on the door of the 7-11 is readily apparent in both the videotape and still created by Kazubowski that are before this Court and were before the Court of Appeal.

The evidence before the Court of Appeal was that Kazubowski had not investigated the case at the time he was sent out to trial. The evidence at the evidentiary

---

[16]Although these photos were produced by expert witness Stutchman, there are seven images that were generated from the video, as Kazubowski testified he had done to generate the six photos. None of Stutchman's photos appear clearer than the one the Court has reviewed that was generated by Kazubowski.

hearing supports that when Petitioner's alibi defense did not pan out, counsel failed to pursue any further investigation that would have supported Petitioner's defense, including locating available evidence to effectively challenge the victim's identification, by establishing the height of the suspect caught on the videotape.

Given trial counsel's testimony before this Court that he knew to look for such a height tape in a convenience store robbery and his prior inconsistent statement that he did not have the videotape analyzed due to financial considerations, these deficiencies are clearly attributable to inattention and not to strategic considerations. *Wiggins*, 123 S.Ct. at 2537-38.

After reviewing the state court record as a whole, this Court is persuaded that counsel's failure to conduct reasonable investigation and to present relevant, available exculpatory evidence "fell below an objective standard of reasonableness," 466 U.S. at 687-88, and the state court's determination of the claim constitutes an unreasonable interpretation of *Strickland*. This Court finds the Supreme Court's holding in *Williams* supports the resolution of this claim. In *Williams*, 529 U.S. 362, the Supreme Court overturned the Fourth Circuit's finding that the Virginia Supreme Court had not unreasonably applied *Strickland* in finding that petitioner was not prejudiced by counsel's failure to properly investigate and offer mitigating evidence. In resolving the federal claim, the district court had found that "even if counsel had neglected to conduct the investigation at the time as a part of a tactical decision. . .tactics as a matter of reasonable performance could not justify the omission." *Id.* at 373.

The same reasoning applies here. Although counsel justified his failure to investigate the height of the suspect on the videotape as a "tactical decision" at the hearing before this Court, that assertion is contradicted by the other evidence in the record, including trial counsel's contradictory statements to appellate counsel regarding his lack of preparation for trial. However, even if he made this decision for "tactical"

31

reasons, tactics do not justify his failure to investigate the evidence, rather than rely on his assumption that the evidence would necessarily be unfavorable.

Nor can it be said that the failure to present such evidence was actually a strategic choice among competing defenses, because undermining the identification by Lomeli was in no way at odds with an alibi defense, especially where no alibi witnesses other than Petitioner was presented in his defense. This Court finds that on the record as a whole, the state courts have unreasonably applied the holding of *Strickland* to the facts of this case.

Moreover, in the record before the Court, there can be no finding that Petitioner suffered no prejudice as a result of counsel's deficiency. The Court finds that the evidence at Petitioner's state trial was not sufficiently strong and that the very persuasive evidence available to counsel to show that the height of the perpetrator was considerably less than Petitioner's creates a "reasonable probability that. . .the factfinder would have had a reasonable doubt respecting guilt." *Luna*, 306 F.3d at 961.

Given the state courts' refusal to provide Petitioner with funds for an expert, the Court of Appeal had before it only counsel's declaration that expert testimony and evidence from the scene was available to establish that the perpetrator was significantly shorter than Petitioner ("no more than 5'5" or 5'6"). However, this Court also heard testimony from such an expert at the evidentiary hearing. In determining prejudice, this Court has considered the totality of the evidence adduced at trial and in the habeas proceedings. *Id.; see also, Rompilla*, 125 S. Ct. at 2467-69.

The testimony from photogrammetry expert Stutchman was very persuasive and it was stipulated by the parties that testimony such as that provided by Stutchman was available and admissible at the time of trial in 1999. Stutchman's investigation led to the conclusion that the measurable height of the suspect from each of the stills from the video was between 5'1" and 5' 6 ½" (and that the reason that there was a 5 ½" variance

32

between the shortest apparent height captured for Petitioner and the tallest was attributable to where he was in his stride in them.)  Although the measurement does not take into consideration the suspect's posture in each still, that fact alone would not account for such a large height discrepancy.

The testimony of Stutchman regarding the available photogrammetry evidence was also uncontroverted, as Respondent failed to offer evidence that this evidence could be discredited in any substantial way.  Although Respondent's expert was precluded from testifying about bio-mechanics or about an asymmetric standard of error which lacked a proper scientific basis, Respondent was not otherwise precluded from calling their expert independently to offer a different conclusion regarding the perpetrator's height or another qualified witness to testify to any perceived errors in Stutchman's assessment.

One of the "tactical" reasons that Kazubowski offered at the hearing for his failure to investigate such testimony was that the prosecution would have simply called an expert offering a different opinion.[17]  However, at the hearing, no such expert was offered that supports that as a legitimate basis for failing to investigate on his part.

In support of their argument that Petitioner was not prejudiced by the omission of this testimony, Respondent argues that "common sense" supports that a person who is running must be shorter than their "doctor's office height."  However, the Court cannot find that fact on the record before it.  Respondent further cross-examined Stutchman with his prior analysis, which found the suspect at his tallest in Exhibit 13 to have been 5'9" tall (instead of 5'6 ½").  However, even if this difference could be established, given that the other stills all reflected a shorter height for the suspect, the evidence still shows a substantial height disparity.  This is particularly essential evidence in a case where the

---

[17]Given his other testimony that he had not considered such an expert, however, this testimony was not credible.

prosecutor argued that Petitioner was 6'2" at trial and there was evidence before the jury that Petitioner was either 6'1" or 6'2".

As the prosecutor and trial counsel stated on summation and this Court finds from reviewing the videotape before the jury and the still photo possessed by counsel, an individual's identification from the videotape would not alone suffice to prove the case beyond a reasonable doubt, given the very poor quality of the picture on the videotape and still. Moreover, there was no physical evidence adduced at trial tying Petitioner to the crime. There was identification testimony from the victim, who had been impeached with regard to her own credibility, as well as testimony from Salet and Emmanuele that the videotape resembled Petitioner and that Salet had previously stated that he was "positive" it was Petitioner. There was also evidence in the record that Lomeli's identification of Petitioner may have been affected by suggestion, an argument that counsel touched on in summation.

_____ This Court finds that Petitioner suffered prejudice, in that there is a reasonable possibility that absent the errors, the factfinder would have had a reasonable doubt respecting guilt  *Luna*, 306 F.3d at 961. Given the relative weakness of the case against Petitioner, counsel's failure to investigate was prejudicial. *Johnson*, 114 F.3d at 838. Clearly, counsel's argument that Lomeli had incorrectly identified Petitioner would have been greatly enhanced by credible evidence from the scene that Petitioner was significantly taller than the person who robbed the 7-11. As such, this Court finds that the state court's failure to find that Petitioner suffered prejudice as a result of his counsel's deficient performance constitutes an unreasonable interpretation of *Strickland.*

While this Court recognizes the substantial costs to our federal system of justice by the existence of the "Great Writ," including at times, "the right to punish admitted offenders", *see, e.g., Engle v. Isaac,* 456 U. S. 107, 126-28 (1982), it remains nonetheless a "bulwark against convictions that violate "fundamental fairness." *Id.* at 126 (citation

omitted).  Where a review of the record as a whole reveals that Petitioner was prejudiced

by ineffective assistance of counsel, the petition must be GRANTED.

## ANALYSIS OF JURY INSTRUCTION CLAIM

Among the instructions which the trial court gave to the jury was the model jury

instruction CALJIC 17.41.1, which provides:

> The integrity of a trial requires that jurors, at all times during their
> deliberations, conduct themselves as required by these instructions.
> Accordingly, should it occur that any juror refuses to deliberate or
> expresses an intention to disregard the law or to decide the case based on
> penalty or punishment, or any other improper basis, it is the obligation of
> the other jurors to immediately advise the Court of the situation.

Petitioner claims that the use of CALJIC No. 17.41.1 interfered with his Sixth

Amendment right to trial by jury and his Fourteenth Amendment right to due process by

inhibiting open and free and open exchange of ideas during deliberations among the jury

because it authorizes the jury to report if another jury is refusing to deliberate or

follow instructions.  He also argues that the instruction interferes with the jury's freedom

to engage in "nullification", by which the jury may disregard the law and render a verdict

in accord with their conscience.  He argues that the use of this jury instruction constitutes

structural error.

In rendering a decision on Petitioner's appeal on this issue, the highest state court

to review this claim in a reasoned decision was the California Court of Appeals.  The

Court of Appeal found that the trial court's use of CALJIC No. 17.41.1 did not implicate

in a significant way a defendant's right to due process and a fair trial, stifle free and open

discussion or infringe upon the jury's power of nullification.  Further, the Court found

that use of the instruction did not constitute structural error and that harmless error

analysis applies.

The Court of Appeal further found that no juror reported or threatened to report

any misconduct and that the jury's process of engaging in deliberations for six hours

including breaks and hearing read-back of witness testimony and each juror's affirmation

in the post-verdict poll revealed that even if use of the instruction was error, that it was clear the error was harmless beyond a reasonable doubt.

I.    Applicable Law

The Ninth Circuit has recently found that CALJIC 17.41.1, which instructs jurors to inform the court of other jurors' misconduct, is not contrary to any existing Supreme Court precedent. *See Brewer v. Hall*, 378 F.3d 952, 955-56 (9th Cir. 2004) (rejecting under AEDPA habeas claims against CALJIC 17.41.1). Moreover, the Supreme Court of California had previously found the instruction to be constitutional. *People v. Engelman*, 28 Cal.4th 436, 439-40 (Cal. 2002). Nonetheless, the California Supreme Court determined that the instruction should not be used in the future because it had "the potential to intrude unnecessarily on the deliberative process and affect it adversely--both with respect to the freedom of jurors to express their differing views during deliberations, and the proper receptivity they should accord the views of their fellow jurors." *Id.* at 440.

II.    Analysis

This Court finds that there is nothing which factually or legally distinguishes Petitioner's case from the holding of *Brewer.* As such, the decision of the Court of Appeal upholding the trial court's use of CALJIC 17.41.1 was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court. Therefore, this claim is DENIED.

**CONCLUSION**

For the foregoing reasons, Petitioner's petition for a writ of habeas corpus with regard to his ineffective assistance claim is GRANTED. Petitioner's conviction is hereby VACATED and the State of California shall either retry Petitioner on the charges or release him from custody within sixty days from the date of this order. Respondent shall notify this Court if a timely notice of appeal of this Court's judgment has been filed.

The Clerk of Court is directed to enter judgment in favor of Petitioner and to notify the California State Bar of this Court's decision by sending a copy of this order to them pursuant to Cal. Bus. & Prof. Code § 6086.7(a)(2).

IT IS SO ORDERED.

DATED: June 22, 2006

_____
JEFFREY S. WHITE
United States District Judge